Frank O. Welch, Administrator, Appellant, v. Sam Greenberg et al., Appellees.

No. 46406.

MAY 2, 1944.

REHEARING DENIED OCTOBER 20, 1944.

H. Wayne Black and Graham & Graham, all of Audubon, and Dalton & Dalton, of Atlantic, for appellant.

Charles S. White and Clark Mantz, both of Audubon, for appellees.

HALE, J.—Plaintiff brought suit against defendants to recover damages for the alleged wrongful death of Hansina Fredericka Layland, his intestate, caused by a collision between the automobile in which she was riding and a truck. The automobile was owned by Dallas Davis and was being driven by George Layland, husband of deceased. The truck was owned by Sam Greenberg and Elmer Greenberg, doing business under the firm name of Greenberg Fruit Company, and was driven by Tona Sparano, their employee.

Plaintiff alleges in Count I of his petition that decedent was a guest in the car which her husband was driving when it collided with the truck, that the driver of the truck was guilty of negligence, and that plaintiff's decedent was free from any contributory negligence. The grounds of negligence include failure to keep on the right-hand side of the pavement, failure to yield one half of the traveled way, excessive speed, failure to drive at a careful and prudent speed, failure to reduce speed, a greater speed than permitted the driver to bring the truck to a stop within the assured clear distance ahead, failure to keep the truck under proper control, failure to keep a lookout, and driving the truck into the automobile on the left side of the highway. In Count II of the petition plaintiff relies upon the doctrine of res ipsa loquitur for the purpose of establishing his claim. Defendants filed a general denial alleging plaintiff's damage was caused solely by the negligence of intestate's husband as operator of the car in which she was riding and contributory negligence of plaintiff's intestate.

On August 27, 1941, George Layland, his wife, Mrs. Dallas Davis, and Helen Davis, infant child of Mr. and Mrs. Dallas Davis, left Audubon to go to Unionville, Iowa, to attend the funeral of Mrs. Thomas Davis, a sister-in-law of Dallas Davis and niece-in-law of George Layland. Dallas Davis had gone to Unionville earlier in the day and finding his sister-in-law dead had authorized his uncle, George Layland, to use his car to bring the other members of the family to Unionville. The party left Audubon about 9 o'clock in the evening, with George Layland driving the Davis car, a 1931-model Chevrolet. They traveled on Highway 71 to Highway 64, thence east on Highway 64 to Des Moines, and south on Highway 60 through Pleasantville. Upon leaving Pleasantville George Layland was driving, with his wife on the front seat beside him. Mrs. Davis, who was sitting in the back seat with her six-months-old baby, went to sleep about the time they left Pleasantville and so did not see the collision. There is no evidence that the car stopped between Pleasantville and the scene of the collision.

About two miles south of Pleasantville Highway 60 reaches Highway 92. It there forms a Y, the west arm of which curves

to the southwest and runs into Highway 92. The east arm of the Y is considerably longer, curving to the southeast and joining Highway 92 at the east end of such curve. The two highways then proceed east as one road, and up a hill of considerable size, and on to Knoxville, where Highway 60 turns off to the south and east through Marion, Monroe, and Appanoose counties. Unionville, which was the destination of the occupants of the car, is in Appanoose county. From the point in the Y where Highway 60 starts to curve to the southeast there is an extension of the road running straight south, cutting Highway 92 almost at right angles, but this extension, from the point where it leaves Highway 60 to the intersection with Highway 92, is not paved but is blacktop. The concrete paving on Highways 60 and 92 is eighteen feet wide. At the point where the two highways join at the east end of the southeast arm of the Y the pavement is about forty feet wide, the four extra feet being on the north side. On Highway 60, a short distance after turning into the southeast arm of the Y from the north there is a "Slow" sign on the right side of the pavement. Several hundred feet farther to the southeast, and about fifty feet from where Highways 60 and 92 unite at the east end of the curve, there is a "Stop" sign on the right side of the pavement. On the north side of the curve is an oil station. Sixty to seventy-five feet east of the intersection of the two highways is a flume on the south side of the pavement, marked by guardposts running east and west. The roads slope from east, west, and northwest down to this flume, the east slope being longer and steeper than the slope from the northwest, but in the immediate vicinity of the flume it is comparatively level. The south shoulder of Highway 92, from the west end of the flume to and beyond the intersection with the blacktop extension, slopes to the south, the highway being higher than the adjacent land.

While the Chevrolet car was coming from the northwest down the curve of Highway 60 into Highway 92, Tona Sparano was driving the heavily loaded truck westward on Highway 92. The two cars met just west of the flume and east of the point where the east arm of Highway 60 merges with Highway 92.

The time was about 1:15 a. m. of August 28, 1941. The owner of the filling station heard the crash but did not observe the Chevrolet car nor see the accident. By the force of the collision appellant's intestate, her husband, and the baby daughter of Mrs. Davis were killed and Mrs. Davis was seriously injured. The Chevrolet car was practically demolished. The injury to the truck was on its right front, but the damage to the Chevrolet car was on its left side, mainly from the left front to the middle of the car, the frame of which was buckled inward from the center of the left side. When struck, the Chevrolet was apparently at nearly right angles with the truck.

It is shown by the evidence that a black mark on the pavement forty-seven or forty-eight feet in length, evidently made by the right front tire of the truck with the brake set, curved in a southwesterly direction from the north half of Highway 92 to the south side of the paving. The witnesses differ as to measurements but all agree that the mark made by the tire began on the north half of the pavement and ended on the south half. There were four witnesses who testified about this black line. Paul Applegate, sheriff of Marion county, arrived on the scene about 1:45 or 1:50 a. m. on the morning of the accident. He testified that the mark commenced two to three feet from the north side of Highway 92 and went in an angle or curve direction to within four feet of the south side of Highway 92. In another part of his examination he stated that it ended about the center of the south lane of the highway and about twenty feet west of the flume. Roy Bingaman, who operated the filling station on the north side of the east arm of the Y, testified that he did not know how long the mark was, but it was from thirty to forty feet and ended about forty to fifty feet east of where the east prong of the Y joined Highway 92. He placed the point where the two highways join about forty-five to fifty feet west of the flume. Fred Clemensen, sheriff of Audubon county, did not reach the scene of the accident until the afternoon of the day it occurred. He testified that the black mark on the pavement began five feet six inches from the north edge of Highway 92 and extended southwest forty-seven feet. He stated there were twenty-seven feet plainly showing in length of what he thought was the rubber-burn mark of the tire

and that the mark was about in the center of Highway 92. Dallas Davis, the owner of the Chevrolet and the father of the child who was killed, was also a witness. He testified the black mark on the highway began on the north side of the highway, and his statement as to the exact place where it began is very indefinite. He said it began about the middle line or north of the black line and went across the pavement south and west. He stated he could not well remember where it ended, that he was mixed up that morning. He attempted an estimate, placing it somewhere in from the south shoulder. He was naturally not very certain as to places or measurements.

On the south half of the paving, from the west end of this black mark and thence on west and diagonally south to the south edge of the pavement, there were broken glass, cuts and jagged notches and scratches in the paving, apparently made by the dragging of hard metal. Here at the south edge the truck and car left the paving and ran onto the shoulder, which sloped to the south, and came to rest about twelve or fifteen feet west of the last post of the guardrailing and one hundred five feet west of the end of the black mark on the pavement, with the car practically at right angles with the truck. From the place where the car and truck left the paving there were cuts and deeply torn places in the grass on the sloping shoulder.

The foregoing are the main facts developed by the testimony. At the conclusion of plaintiff's testimony the court overruled motion of defendants to require plaintiff to elect upon which count of his petition he would stand. Defendants' motion to take the case from the jury was sustained. There were various grounds in the motion for directed verdict, but as we view the case it is unnecessary to consider other than those grounds of Divisions I and II referring to the lack of evidence of defendants' negligence. And therefore, for the purposes of this case, we may assume, as argued by appellant, that Mrs. Layland, plaintiff's intestate, under the no-eyewitness rule was not negligent; and for such purposes we may likewise assume that the negligence of intestate's husband, the driver of the Chevrolet, may not be imputed to her.

I. It is incumbent upon appellant, as plaintiff, to

show that the proximate cause of the injury was the negligence of the driver of the truck. Where the evidence is circumstantial, it must be established that there is such negligence as makes the plaintiff's theory reasonable, probable, and not merely a possibility, and more probable than any other theory. The question here is, Does the evidence sufficiently show appellees' negligence to make it a question for the jury? In considering this question appellant's evidence must be viewed in its most favorable light with all reasonable inferences properly deducible therefrom. This case must depend upon the physical facts as circumstantial evidence.

It is suggested by appellant in argument that instead of coming down the southeast arm of the Y of Highway 60 the Chevrolet car traveled from Highway 60 straight south over the blacktop extension which joins Highway 92 nearly at right angles. There is no evidence that the Chevrolet car ever traveled on the blacktop road running south from Highway 60, or that it ever made the square turn east from the blacktop or traveled due east on Highway 92. To have done so the Chevrolet must have left the well-marked concrete highway, traveled over the blacktop and made a turn almost at right angles to get into the south lane of Highway 92 going east. This is contrary to any reasonable probability, since the driver of the car was traveling upon Highway 60, which he expected to traverse nearly the full extent of his journey. It is not probable, but merely possible, that a person traveling upon a well-marked thoroughfare, paved with concrete, intended to or did leave the same to travel over a blacktop road and make the unusual left turn to the east. A further reason for this lack of probability is the fact that the right front wheel and the right side of the truck were injured and no injury occurred to its left front side. Had the truck been in the north lane of Highway 92 and the Chevrolet car in the south lane thereof, in order to produce the results shown in the photographs of the car and truck the collision must have occurred farther south of the center line of the pavement than appears from the circumstantial evidence; and to strike as it did, it would have been necessary for the truck to be going in a southerly or southeasterly direction, none of which is indicated by the

evidence. Such a turn to the south or southeast is impossible to have occurred under the evidence. Likewise, had the Chevrolet car been in the south lane of Highway 92, and the truck proceeding west in the north lane thereof, and had veered over to the south far enough to strike the car, the injury would have been to the left side of the truck. The car was carried by the heavy truck in a general westerly direction, the line of travel of the truck. Had the car been struck in the south lane in such a manner as to injure only the right side of the truck, the direction of the two vehicles would have been south instead of west. When found, the vehicles were locked together at right angles. The resultant path of the two cars, the injuries to both, could not have occurred had the Chevrolet been traveling east instead of southeast, as it would travel coming from Highway 60 on the southeast arm of the Y. Hence the theory that the Chevrolet car left Highway 60 and proceeded directly south over the blacktop extension and onto Highway 92 at nearly right angles from the north is untenable.

The only other theory of the crash, which theory was considered throughout the trial, is that the Chevrolet car, coming from the northwest down the east arm of Highway 60, was struck at or very near the two center lines of Highway 92. The conclusion which would be drawn under such circumstances would be that the car passed out of the arm of the Y and was proceeding across the road to straighten out in the south lane heading east on Highway 92, so that at the point of collision the Chevrolet car, under the physical facts, must have been almost at right angles with the truck, the position in which the cars were found when they came to rest on the shoulder south of the highway. Sparano, the driver of the truck traveling west in the north lane of Highway 92, must have observed the close proximity of the car coming down the east arm of the Y of Highway 60, and to avoid the collision set his brakes, swerving the truck to the left, and the brakes were released at the point of contact, which would be at or very near the west end of the curved black mark on the pavement. In any event, it seems not possible for the driver of the truck to have avoided striking the car, since part of the Chevrolet car was north of the

center lines of the pavement. This emergency attempt to avoid the collision, whether the truck was steered to the left or the setting of the brakes so swerved it, was unavailing. From the position of the car the collision could not have been avoided whether Sparano was south or north of the black center lines. The Chevrolet car, from its appearance as the result of the blow, was apparently partly in the south lane of Highway 92 and partly in the north lane. The injury shows that the Chevrolet car could not have been wholly in the south lane of the highway or it would have received a blow on its side, not a direct blow from the right side of the truck.

It is argued that the evidence of the force of the impact indicates negligence as to excessive speed of defendants. The combined speed of the two vehicles colliding with each other at any reasonable speed would necessarily have disastrous results. From the manner in which they struck, at or nearly at right angles, the impact of the heavily loaded and westward-moving truck must have carried both cars in the line of travel of the truck rather than in that of the lighter Chevrolet car. The direction of the movement of the two cars shows that they did proceed to the west and south.

To submit to the jury the question of whether the speed was excessive or was unreasonable under the circumstances, or that the speed was not reduced, would have invited a mere guess based on no valid evidence. We know nothing of the speed of the Chevrolet car. It may or may not have been excessive. There is nothing to indicate that the speed of the truck was excessive. Various cases are cited by appellant where the speed of a car was inferred. This may be done if the circumstances warrant, as we do not think they do here. Among other cases, appellant cites Hawkins v. Burton, 225 Iowa 707, 281 N. W. 342, which furnishes little support for his contention. The circumstances relating to the collision on the narrow bridge in that case are so different from those in the instant case as to furnish no parallel. Each case must be determined by its own facts. The statement in the Hawkins case as to estimating speed by the distance traveled would hardly furnish a guide here, since in this case the weight of the

vehicles, the slope of the ground, and other differing conditions must all enter into consideration.

Nor are the circumstances detailed in Hayes v. Stunkard, 233 Iowa 582, 10 N. W. 2d 19, or the rule quoted as to two reasonable theories of value in determining the question here presented. We believe that neither theory as to the line of travel of the Chevrolet car suggested by appellant presented a jury question; and both theories are untenable as indicating negligence. Giving due credit, as we should, to appellant's testimony, and resolving it in its most favorable aspect for the appellant, we do not think that reasonable minds could differ on the question of whether or not appellant has established the negligence of the driver of the truck by the circumstantial evidence. In such case, it being the duty of the appellant to establish that the proximate cause of the damage was the negligence of appellees' driver, there could be no recovery and the ruling of the district court on the motion would therefore be correct. We do not find that the evidence indicates or is sufficient to warrant the submission of the case to the jury on the question of speed.

Appellant and appellees devote considerable discussion to the questions of the no-eyewitness rule and lack of contributory negligence of appellant's intestate. The questions are fully and ably discussed in the briefs, but since we fail to find proof of appellees' negligence sufficient to warrant submission to the jury it is unnecessary for us to consider those matters here.

II. We do not think that the question of res ipsa loquitur enters into this case. We have frequently ruled that in order that this doctrine may apply the instrumentalities causing injury and damage must be in the exclusive control of the person charged, and such is argued by appellees herein. Some of our most recent cases reiterate this doctrine. See Whetstine v. Moravec, 228 Iowa 352, 368, 291 N. W. 425, 433, where the court says:

"The necessity of complete and exclusive control of the instrumentality, for the application of the res ipsa loquitur rule, has been repeatedly referred to by the court." (Citing cases.)

See, also, Pearson v. Butts, 224 Iowa 376, 276 N. W. 65. In our most recent case of Rodefer v. Clinton Turner Verein, 232 Iowa 691, 694, 6 N. W. 2d 17, 19, we refer to Whetstine v. Moravec, supra, and quote the foregoing statement therefrom. See, also, Sutcliffe v. Fort Dodge Gas & Elec. Co., 218 Iowa 1386, 257 N. W. 406. The foregoing authorities, with others from various jurisdictions, are all cited by appellees and the rule seems well established. It is apparent from what we have heretofore stated that the instrumentalities resulting in the deaths and damage were not under the exclusive control of appellees or the driver of the truck, since the car was under the exclusive management and control of the husband of appellant's intestate.

Further, to apply the rule of res ipsa loquitur it must appear more probable that the accident and damages were brought about by appellees' negligence than by any other cause. Since we have held that the circumstantial evidence in this case does not warrant the submission of the question of appellees' negligence there could be no recovery on this count. As the foregoing case of Whetstine v. Moravec holds, if the probabilities are even on equal footings, this is not sufficient. As stated therein:

"It is, of course, not sufficient to show that the negligence charged might fairly and reasonably have caused the injury, if the circumstances shown indicate an equal probability that it was due to some other cause." [228 Iowa 363, 291 N. W. 431.]

And such is the holding of Swaim v. Chicago, R. I. & P. Ry. Co., 187 Iowa 466, 174 N. W. 384 [certiorari denied 252 U. S. 577, 40 S. Ct. 344, 64 L. Ed. 725]. Appellees further cite 45 C. J. 1213, section 780, and Rodefer v. Clinton Turner Verein, supra, which cites Tisher v. Union Pac. Ry. Co., 173 Iowa 567, 570, 155 N. W. 975, 976, wherein the rule is stated as follows:

"The causal connection between the injury and the negligence of the defendant may be proved by direct or circumstantial evidence. If the latter, it must be something more than consistent with plaintiff's theory of how the accident

occurred. It must be such as to make that theory reasonably probable, not merely possible, and more probable than any other hypothesis based on such evidence."

We conclude that as to both counts the ruling of the court on the motion to direct verdict was correct and that the cause should be, and is, affirmed.

Appellant's motion to strike amendment to abstract, submitted with the case, is overruled.—Affirmed.

SMITH, C. J., and MULRONEY, MILLER, and WENNERSTRUM, JJ., concur.

BLISS, OLIVER, and GARFIELD, JJ., dissent.

MANTZ, J., takes no part.

GARFIELD, J. (dissenting)—I respectfully dissent.

After stating that the motion for directed verdict presented "many difficult questions," the trial judge assigned two reasons for his ruling. First, he held that Sparano, defendant truck driver, who did not testify, was such an eyewitness as to deprive plaintiff of the benefit of the no-eyewitness rule; therefore, as a matter of law, there was a failure to prove freedom from contributory negligence. This theory is clearly untenable. The collision occurred in the middle of a dark night. By no fair possibility could Sparano have observed what decedent, a mere passenger, did or failed to do for her own safety just prior to the collision. See Jensvold v. Chicago G. W. R. Co., 234 Iowa 627, 630, 12 N. W. 2d 293, 295, and cases cited. We have gone much further in according a decedent the benefit of the no-eyewitness rule than we are asked to go here. Hayes v. Stunkard, 233 Iowa 582, 589, 10 N. W. 2d 19, 23; Davidson v. Vast, 233 Iowa 534, 541, 10 N. W. 2d 12, 17, and cases cited.

The other reason assigned for the directed verdict is that the evidence was circumstantial and plaintiff's theory is not "the only conclusion that can fairly or reasonably be drawn" therefrom. The test of the measure of proof by circumstantial evidence which was applied below has not been followed by us in any of several recent decisions. In this court both sides argue and the majority hold that the applicable rule is, where

the evidence is circumstantial, it must be such as to make plaintiff's theory reasonably probable, not merely possible, and more probable than any other theory based on such evidence. I have no quarrel with this rule.

The reasons assigned by the trial judge for the directed verdict are almost identical with those on which a trial court based a like ruling in Hayes v. Stunkard, supra. There, as here, each side had a theory of the accident. There, as here, plaintiff's evidence was circumstantial. The Hayes opinion, in which we reversed the trial court, contains a full discussion, with ample citation of authority, of the required measure of proof by circumstantial evidence. We there reiterate the rule that a "'plaintiff is not bound to negative every other conceivable theory or hypothesis which ingenuity may invent to account for his injury,'" and assert, "The facts may be established by circumstantial evidence as well as, and sometimes better than, by the direct testimony of witnesses." [233 Iowa 586, 10 N. W. 2d 21.]

It is plaintiff's theory that the proximate cause, or at least a concurring cause, of the collision was the failure of the truck to yield the south half of the pavement to the automobile. I think this theory clearly has such support in the evidence as to present a jury question. But, in any event, I think a jury question was presented even under defendants' theory or any rational theory presented by the evidence.

Defendants' brief states:

"The only rational theory of this case is that * * * the car driven by George Layland drove past the stop sign on Highway 60 and drove into the truck on said Highway 92. This was negligence and the proximate cause of the collision. * * * Doubtless, when the driver of the truck saw that George Layland * * * was not going to stop at the stop sign, and that a crash was likely to occur, he began to pull his truck to the left in order to attempt to get out of the way of the car."

Defendants further say in argument: "The driver of the defendants' truck was swerving his truck to the left out of the north lane of 92 in an attempt to avoid the collision." It is therefore apparent that defendants concede the truck swerved

to the left just before the collision. There is no evidence, nor do the majority find, that the Layland car did not stop at the stop sign.

It clearly appears that a curved black mark was left on the pavement, caused by the *right* front tire of the truck; the mark was forty-seven or forty-eight feet long; the east end or beginning of the mark indicates where Sparano applied his brakes; the point of impact was near the west end of the mark, *forty-eight feet east of the junction of 92 and the east arm of 60.* The jury could well have found that this mark made by the *right* front truck tire began at least five and one-half feet south of the north edge of the pavement and ended near the point of impact with the *left* side of the Chevrolet within four feet from the south edge of the pavement.

There were four principal witnesses: Bingaman, the oil station operator; Sheriff Applegate, of Marion county; Davis, the owner of the Chevrolet; Sheriff Clemensen, of Audubon county. All but Davis were wholly disinterested.

Bingaman, at the scene almost instantly, testified:

"I heard a crash and I looked around. There seemed to be a blur on the south side of the road and down below just a little. * * * The marks commenced near the center of the road * * * It curved clear on the south half of highway No. 92. It was just one black mark. * * * This black mark extended south past the center of the road."

Sheriff Applegate arrived within a half hour and made an investigation lasting nearly two hours. He testified:

"There was a dark heavy black line starting at a point on highway No. 92, extending 48 feet in a southwesterly direction from the north side of the highway No. 92, to the south side of this highway. This black mark ended about the center of the south lane [shown to be nine feet wide] of highway No. 92. * * * The black mark commenced from two to three feet from the north side of highway No. 92 and goes at an angle, or in a curved direction, to within four feet of the south side of 92. That is where the black mark ended."

Sheriff Applegate placed marks on a diagram of the scene

of the collision showing that the tire mark began about the middle of the north lane and ended about the middle of the south lane of 92.

Davis testified the tire mark ended "somewhere in toward the south shoulder"; near this point "there was a hole dug out in the pavement * * * right up close to the curb * * * this one in particular I noticed, because it was so deep"; the tire mark began "right close to the center line" of 92.

Sheriff Clemensen *measured* five feet six inches from the north edge of the pavement to the beginning of the tire mark. He also measured ninety-six feet four inches from the stop sign to the large hole in the pavement near the west end of the tire mark. He saw other marks southwest of this hole. On the south shoulder there was a "hole big enough to bury a tractor."

There is considerable testimony about cuts and scars on the pavement, broken glass, oil, water, and wreckage for a distance of one hundred five feet southwest from the end of the tire mark and the large gouge in the paving to where the truck came to rest against a fence about straight south of the stop sign. The three dead bodies and the injured lady were all found near where the vehicles came to rest.

Since the jury might well have found the mark left by the *right* front truck tire ended near the point of impact with the *left* side of the Chevrolet, within four feet from the south edge of the pavement, forty-eight feet east of the junction of 92 and 60, the conclusion is surely justified that the collision occurred at a place where, prima facie at least, the Chevrolet had a right to be and the truck had no right. The truck started to veer to the left when its right front wheel was at a point which Sheriff Clemensen measured to be five and one-half feet from the north edge of the pavement. The truck appears to be about eight feet wide. The north lane of the highway is but nine feet wide. It is therefore apparent that more than half the width of the truck was south of the north lane when it started to veer to the left.

The majority concede that the point of contact was "at or very near the west end of the curved black mark on the pavement." However, in reaching their conclusion they practically

ignore this fact as well as the evidence summarized in this dissent. They say:

"In any event, it seems not possible for the driver of the truck to have avoided striking the car, since part of the Chevrolet car was north of the center lines of the pavement. * * * From the position of the car the collision could not have been avoided whether Sparano was south or north of the black center lines. The Chevrolet car, from its appearance as the result of the blow, was apparently partly in the south lane of Highway 92 and partly in the north lane."

Needless to say, in my opinion these and other conclusions of the majority are entirely unwarranted. They are not the only conclusions which reasonable minds can reach from all the evidence, viewed in the light most favorable to plaintiff. They are reached only by ignoring practically undisputed evidence that at the place of collision the right front truck tire was within about four feet from the south edge of the pavement.

As the principal basis for their decision, the majority find that, "The injury to the truck was on its right front, but the damage to the Chevrolet car was on its left side, mainly from the left front to the middle of the car * * *." From this they conclude, "When struck, the Chevrolet was apparently at nearly right angles with the truck." I think the location of the damage to both vehicles is entirely consistent with the conclusion that the collision occurred close to the south edge of the pavement.

While there is some testimony that the damage to the Chevrolet was mainly from its left front to middle, there is much other testimony, and the picture, defendants' Exhibit A, shows it was practically a total wreck. Bingaman testified, "The car was badly wrecked. It was just torn nearly all to pieces." Sheriff Applegate said it was "completely demolished, wrecked." Davis, the owner, testified the Chevrolet was "totally wrecked." When asked what part seemed to be damaged the most, Davis answered, "I could not say. It was all a wreck." Sheriff Clemensen said, "I would call the car a total wreck." The majority opinion itself says, "The Chevrolet

car was practically demolished.'' But in reaching their decision they ignore this statement as well as the above evidence and accept as a verity testimony that the damage to the Chevrolet was mainly on the left side. Even if the damage to the Chevrolet caused by the truck, concededly headed to the southwest, was ''mainly from the left front to the middle,'' this is in no way inconsistent with the conclusion that the collision occurred near the south edge of the paving, as indicated by the marks thereon.

Regarding the truck, Sheriff Applegate testified the damage was ''Right in front * * * Probably was damage to the whole front end of the truck.'' He also said the radiator grill was broken. The picture, Exhibit A, shows this. Davis said ''the front end was hurt some'' and the radiator grill was broken. Sheriff Clemensen said the damage was ''to the grill and radiator and an injury to the [right] fender.'' Bingaman and Davis testified and the picture, Exhibit A, shows that when the two vehicles came to rest against a fence the Chevrolet was pressed against the right front wheel of the truck. They were ''locked together.'' Before the vehicles came to rest, the truck, apparently at least partly out of control, had pushed the automobile a distance of one hundred five feet. It is entirely proper to conclude that the right fender, or for that matter, the ''right front'' of the truck, was damaged when the vehicles came to rest, or at least after the original impact.

But even assuming, contrary to the markings on the highway, that at the time of impact the Chevrolet was not entirely in the south half of the road or had not straightened out to head directly east, it does not justify the majority holding that it was ''not possible for the driver of the truck to have avoided striking the car.'' Nor does it justify the directed verdict. As the majority concede, any negligence of the driver, Layland, is not to be imputed to decedent. It would be a defense only if it were the sole proximate cause. Johnson v. McVicker, 216 Iowa 654, 657, 247 N. W. 488, and cases cited; Usher v. Stafford, 227 Iowa 443, 447, 288 N. W. 432. If Layland were negligent in not yielding the entire north half of the highway to the truck (a conclusion that rests on conjecture), this would not excuse the negli-

gence of Sparano, who is shown almost beyond dispute not to have yielded the south half of the highway to the Chevrolet. At most, it is a case of concurring negligence on the part of Layland and the trucker for which defendants are liable.

The statute in effect since 1860 (now section 5024.02, Code, 1939) required Sparano to yield the south half of the highway to the Chevrolet. His failure so to do makes him prima facie negligent. Kisling v. Thierman, 214 Iowa 911, 914, 243 N. W. 552, and cases cited; McWilliams v. Beck, 220 Iowa 906, 909, 910, 262 N. W. 781; 5 Am. Jur. 661, section 286; annotations 24 A. L. R. 1304, 63 A. L. R. 277. It was Sparano's duty to excuse or justify his presence on the wrong side of the highway. 9 Blashfield Cyclopedia Automobile Law and Procedure, Perm. Ed., 446, 451, section 6092; pages 494 ff., section 6113; Hubbard v. Bartholomew, 163 Iowa 58, 63, 64, 144 N. W. 13, 49 L. R. A., N. S., 443. This he failed to do. If it could be said that Code section 5024.02 is not applicable here, I think a finding would be warranted that by attempting to pass the Chevrolet on the left Sparano failed to exercise ordinary care under the circumstances.

Code section 5023.04 required Sparano to have the truck "under control" and to "reduce the speed to a reasonable and proper rate" when approaching and traversing the intersection of these much-traveled highways. I think there is substantial evidence of a violation of this requirement. A car is "under control" when so operated that it can be brought to a stop with reasonable celerity. Martin v. Momyer, 230 Iowa 1158, 1167, 300 N. W. 310, 315, and cases cited. Sheriff Applegate testified from his examination that "the right front wheel had drug heavily with the brakes" for forty-eight feet to the point of collision. The truck then pushed the Chevrolet one hundred five feet, largely on the dirt and grass at the side of the road, until the vehicles came to rest against a fence. It cannot be said as a matter of law this was ability to stop with reasonable celerity. It is fair to conclude the truck was at least partially out of control during the entire forty-eight feet, as well as the one hundred five feet.

As to speed, the jury could find Sparano failed to reduce the speed of his truck effectively and was in too much of a

hurry to get to Omaha with his load of peaches. The application of the brakes probably reduced the speed but thereby the driver lost at least partial control. It is hard to isolate speed from other elements. The propriety of any speed depends largely upon surrounding circumstances and the driver's care in matters other than speed. Davidson v. Vast, 233 Iowa 534, 540, 10 N. W. 2d 12, 16, and cases cited. That Sparano made no attempt to guide his truck to the right side of the pavement but chose to attempt to go around the Chevrolet on the left has a proper bearing on the issue of speed. Indeed, the conclusion is warranted that Sparano did not act with the consideration for the safety of the passengers in the Chevrolet required of the ordinarily prudent person and that had he done so, this tragic loss of life would have been avoided.

In support of this dissent, see In re Estate of Goretska, 234 Iowa 1080, 13 N. W. 2d 432; Hayes v. Stunkard, 233 Iowa 582, 10 N. W. 2d 19; Davidson v. Vast, 233 Iowa 534, 10 N. W. 2d 12; Fraser v. Brannigan, 228 Iowa 572, 293 N. W. 50; Hawkins v. Burton, 225 Iowa 707, 281 N. W. 342; Cerny v. Secor, 211 Iowa 1232, 234 N. W. 193. In the Goretska case, supra, all the occupants of both vehicles (the only eyewitnesses) were killed. The evidence, wholly circumstantial, consisted principally of the tracks of the two vehicles. But there was some dispute even as to the tracks, which does not exist here. All members of this court agreed that the issues were for the jury and that the court properly refused to direct a verdict for defendant. The Goretska dissent deals with another question in the case. In the Hayes, Davidson, and Hawkins cases the evidence for plaintiff was circumstantial but there was direct evidence of the defendant's version which, if believed, would negative recovery. In each case it was held a jury question was presented. Except on the question of res ipsa loquitur, the majority cite no authority to sustain them.

I would reverse.

BLISS and OLIVER, JJ., join in this dissent.